### 24581.   STATE HIGHWAY BOARD OF GEORGIA *v.* SHIERLING, administratrix.

STEPHENS, J.  1. Where property is taken, under power of eminent domain, for a public use, its market value for all purposes for which the property is available is the true measure of the owner's compensation. The value of the property to the condemnor for the specific purpose for which the property is taken is not the basis for measuring the amount of compensation payable to the owner. *Harrison* v. *Young*, 9 *Ga.* 359; *Young* v. *Harrison*, 17 *Ga.* 30; *Young* v. *Harrison*, 21 *Ga.* 584; *Gate City Terminal Co.* v. *Thrower*, 136 *Ga.* 456 (71 S. E. 903); *Central Georgia Power Co.* v. *Mays*, 137 *Ga.* 120 (72 S. E. 900); *Central Georgia Power Co.* v. *Stone*, 139 *Ga.* 416 (77 S. E. 565). The availability of property for the specific use for which it was taken and to which it is put by the condemnor is, however, an element to be considered in estimating the value to the owner for all purposes for which the property is available. *Gate City Terminal Co.* v. *Thrower*, supra; Sargent *v.* Merrimac, 196 Mass. 171 (81 N. E. 970, 11 L. R. A. (N. S.) 996, 124 Am. St. R. 528); Little Rock Junction Ry. *v.* Woodruff, 49 Ark. 381 (5 S. W. 792); Boom Co. *v.* Patterson, 98 U. S. 403 (25 L. ed. 206); Lewis on Eminent Domain, 1233. Where property is condemned for the purpose of being used in the construction of a public road, its availability not only for the establishment of a right of way for a public road, but also, by reason of its width beyond the width required for the width of a roadway, for furnishing dirt for use in making a fill in the roadway, is an element for consideration in arriving at its true market value for all purposes, and therefore the amount of compensation payable to the owner. This is not in conflict with the rule announced in *Selma, Rome & Dalton Railroad Co.* v. *Keith*, 53 *Ga.* 178, that the issue is the amount of damage sustained by the landowner in the taking of his land, and not its value to the condemnor or the profit to him in condemnor's use of the land.

2. On the trial of an issue in condemnation proceedings, where a strip of land is sought to be condemned by the State Highway Board for the purpose of being appropriated to the building of a public road, it was not error as against that board to admit evidence tending to illustrate the availability of the land to the board for use in furnishing dirt to be used in making a fill in the roadway, where the evidence was not admitted for the purpose of affording the landowner an element for re-

covery of the value of the dirt so used, or recovery of a sum representing the value of the land to the board for the specific purpose of its use by the board in obtaining dirt therefrom to be used in the construction of the roadway in addition to the value of the land to the owner for all purposes, but was admitted for the purpose, as the court in the charge to the jury stated, "of illustrating the market value of the property taken, and to assist the jury in arriving at the true market value of the property," which "is not its market value for any particular purpose, but its market value for any and all purposes," and that "in arriving at this general market value" the jury "are authorized to consider its availability and adaptability and value for any particular purpose or use for which the evidence shows it might be used."

3. On the trial of a condemnation proceeding the condemnor stands in the relation of plaintiff and the condemnee stands in the relation of defendant; and the burden of proof is upon the plaintiff, where the property has been taken or damaged, to establish by a preponderance of the evidence what amount of money constitutes just and adequate compensation. *Streyer* v. *Georgia, Southern & Florida Railroad Co.*, 90 *Ga.* 56 (15 S. E. 637). Therefore it is not error for the court to charge the jury that the plaintiff carries the burden to establish his contentions by a preponderance of the evidence. Where the trial is on appeal by the plaintiff from the award of compensation made by assessors, the charge is not subject to the objection that it places the burden of proof on the plaintiff to show by a preponderance of the evidence that the award made by the assessors was incorrect.

4. On the trial of condemnation proceedings, where a strip of land had been taken from land belonging to the condemnee for the purpose of being used in the construction of a public road, where it appeared that in the construction of the road a fill was made which left the remaining land of the defendant below the grade of the road, and where there was evidence that from the manner in which the road was constructed the defendant's land would be damaged by an overflow during freshets, and the soil washed away, the evidence authorized the inference that the defendant's land from which the strip had been taken for road purposes had suffered consequential damages in an amount to be estimated by the jury; and the court did not err in submitting this issue.

5. The verdict in the amount found for the landowner, the condemnee, was authorized, and no error appears. The court did not err in overruling the motion for new trial.

> *Judgment affirmed.* *Sutton, J., concurs.* *Jenkins, P. J., dissents.*

DECIDED SEPTEMBER 28, 1935. REHEARING DENIED OCTOBER 4, 1935.

*M. J. Yeomans, attorney-general, B. S. Miller, A. D. Tucker, G. Y. Harrell,* for plaintiff.

*R. S. Wimberly, Hugh Howell,* for defendant.

JENKINS, P. J., dissenting. Under the disputed testimony, the verdict was not without evidence to support it. It is upon the very

important question as to what constitutes the correct measure of damages that I feel compelled to differ with what is said by my colleagues. There is little, if any, difference between them and myself as to the correctness of the definition set forth in the majority opinion, as follows: "Where property is taken, under power of eminent domain, for a public use, its market value for all purposes for which the property is available is the true measure of the owner's compensation. The value of the property to the condemnor for the specific purpose for which the property is taken is not the basis for measuring the amount of compensation payable to the owner." The difference between us arises as to what constitutes the "market value for all purposes." It appears that the State Highway Board in constructing a road across certain bottom lands acquired partly by purchase and partly by condemnation a right of way 150 feet wide—wider than necessary for the road-bed, in order that it might construct a "berm ditch" 25 feet wide and 4 or 5 feet deep, parallel to the highway, for the purpose of draining the land and in order to obtain dirt for filling in and elevating the road-bed. The contention of the defendant in error is that the highway board "was obtaining this for the object and purpose of obtaining dirt with which to construct the large fill that had to be built across this land, as the dirt could be obtained at a much less cost in this way than by hauling it in from other lands for this purpose. The land across which this roadway was built is a strip of flat bottom land on the Hannahatchee Creek subject to overflow, and it was necessary to build a fill for the whole distance of considerable width and height, and naturally it took a great deal of dirt to build this fill. And it is defendant's contention that the availability of her land to furnish the dirt out of which this fill could be constructed is an element that affects its market value just as if her land had contained large deposits of lime or sand or other paving material which would have affected its value in paving a highway across it, and just as its availability for a bridge site would have affected its value in case it had been necessary for the highway to construct a bridge at this point." Counsel for the defendant strongly rely upon and quote from *Harrison* v. *Young,* 9 *Ga.* 359, 364, as follows: "Counsel for the Harrisons then proposed to prove the value of the land seized and occupied by the company as a *bridge site,* and that the land for the western abut-

ment cost the company $6000, and that the location on the eastern side of the river was worth equally as much, and insisted that the value of the land for this and all other legitimate purposes was proper to be submitted to the jury, to enable them to estimate correctly the damages to be paid by the company. But this the court refused, and restricted the evidence to the actual value of the land for its agricultural and productive qualities. When land or any other property is taken for public use, the owner is entitled to compensation for its whole value;—not for this or that particular object, but for all purposes to which it may be appropriated. Suppose I have on my premises a waterfall admirably adapted to machinery, and a portion of my land is seized and applied to the erection of a bridge or the construction of a railroad, so as to render the waterpower unavailable; in computing my damages, ought not this fact to be taken into consideration? The value of land or anything else is its price in the market. Concede, then, that the right to erect this bridge is not in the Harrisons, but has been bestowed by the State upon this company, ought not the owners of the land to be paid for the worth of the site to the company? Who, in making investments of capital in real estate, is not influenced by the consideration that it will be valuable for a town, bridge, ferry, mill, manufacture, &c.? We hold, therefore, that our brother Warren, who ruled this case below, was mistaken as to the law which regulates this branch of the investigation."

They quote from the same case when again before the Supreme Court, 17 *Ga.* 30, 38 : "In such case, it would certainly be a great hardship, not to be tolerated, in a free country, if a citizen owning a piece of land of this description, whose prospective value, derived from its situation as affording facilities for a bridge site, was as *much his property* as was its soil for planting purposes (it may, indeed, have been purchased with reference to such value), could be compelled to part with the same, and forced to give up his property in the prospective value of the ground, and receive only its value for agricultural purposes, or its value as a bridge site on the day when it is taken, estimated by the trade and travel which would that day have passed over it if the bridge had been built. Such could not be a case of 'just compensation.'" They quote from *Central Georgia Power Co.* v. *Stone,* 139 *Ga.* 416 (supra), as follows: "In determining what this market value is, the jury are not

confined to considering the use to which it is actually being put by the owner. He may have used a valuable corner for a stable or for a pigsty. But he is not obliged to have it priced on that basis. The character, location, size, and shape of the property, and its availability for different uses may be shown. A corner lot in a town may be proved to be adapted to use as a garden, or as a location for a residence, or for a site for a store or office building. This may not only increase the number of probable buyers, but also the probable price which a buyer would pay for it. If it were proved that the lot had a coal or iron deposit under the surface, this would be for consideration in estimating the market value. And so of other possible elements, such as suitability for a bridge site or a dam or reservoir. These would not furnish separate items for recovery, but would be legitimate for consideration in estimating market value." In their admirable brief counsel cite *Central Georgia Power Co.* v. *Mays,* 137 *Ga.* 120 (supra), and many other authorities. They quote from case-note in 11 L. R. A. (N. S.) 996, as follows: "The weight of authority holds that the value of the property taken by eminent domain for the specific purpose for which it is taken is not the basis on which the owner is entitled to be compensated. Its availability for that purpose, however, is an element to be considered in arriving at its market value, the market value being the true measure of compensation." This last citation would seem to form the real basis of the rule adopted by the majority opinion in the instant case.

I have quoted the authorities at some length, because I consider that the case before us presents a question of grave importance, one which, if not decided correctly, may render prohibitory the cost of acquiring lands for highways by condemnation proceedings. As already stated, I do not differ much, if any, with my brethren, in the quoted definition of what constitutes the proper measure of damages; but in the application of the definition to a case such as the one here presented. I can well understand that if, as in the *Young* case, one should own the key-site for a dam or a bridge, the fact that his property held such an actual physical advantage should be taken into account in ascertaining its true market value. When the trail of the first great highway was blazed from the Atlantic seaboard across the mountains through Cumberland Gap into the great middle west, the possession of the one great opening through

that mighty range was a property of no mean market value. In like manner, the two high adjoining bluffs between which runs the Mississippi were valuable assets as measured in market value when the time came to span the great stream with a bridge under which river traffic could pass. Of course, it is easy enough to see that if a farm used for agricultural purposes contains a site for developing valuable water-power, or contains valuable stone or minerals, the market value is thereby augmented. Here no such, or similar, situation exists. The highway board was authorized to locate the highway where it chose. The land where it ran had no special value other than for agricultural purposes. This seems to be admittedly true, unless, as contended, the location of the road-bed created a new and additional value to that portion of the land condemned which did not constitute the road-bed, but lay parallel and adjacent thereto, for the reason that, being nearer to the road-bed, the dirt was more suitable "for road-building purposes" than other dirt farther distant. Of course, if the fact that it became known that an improved highway would be located where it was, caused a "boom" in value of neighboring property, then, under the ruling in the *Thrower* case (136 *Ga.* 456(3)), the highway board, when it came to condemn the land, would have to pay any such increased market value as then actually existed. It would, of course, also have to pay any consequential damages which might accrue to other property injured but not taken. But unless the location of the road-bed of a highway endows it with the Midas touch, it does not seem that the landowner should be permitted to dissect the land condemned, and say to the highway board: This part was worth so much for your road-bed, and the other part has mounted sky-high because it is more accessible to the road-bed than other more distant and more inaccessible land for filling-in purposes. When the highway board pays the landowner the full market value of the land and any consequential damages which might flow, it is the board's to do with as they please; and they should not be charged over again, and at a mounting artificial price, for the dirt from the land which they buy. But it is said that they were not buying dirt, but property which the increase in the value of the dirt made more valuable. As already stated, I can readily see that any special, inherent availability of the property condemned is an element to be considered in arriving at its market value; but it is not claimed

that any portion of this condemned property had any special or peculiar value. It was just plain dirt, just mother earth, like most of the world is made of. Being bottom land, it was richer perhaps than average land. Being on an improved State highway, the farm was perhaps more accessible. But none of these elements of market value are disputed. Must the highway board, in effect, pay again and at soaring artificial prices for the dirt from the land which they condemn? If so, like Shakespeare's jealousy, "which makes its own food on which it feeds," there is no end to the vicious circle. The board would be helpless. The next most accessible landowner might just as well take the same position, and the next, and still the next, until the highway department, forced further and further back to obtain soil, finds that the cost of just plain ordinary dirt has become prohibitive. Accordingly, paraphrasing somewhat the rule as stated in the majority opinion, and as stated in the case-note quoted from L. R. A., I think that a proper statement of the rule would be that the measure of damages for property taken by eminent domain is not its value to the one so taking it for the purpose for which it is taken; but, being compensatory in its nature, the damage is measured by the loss sustained by the landowner, taking into consideration all purposes for which the property is available, including any special, peculiar and inherent availability of the property for the particular use designed by the condemnor; but not including any fictitious value of any portion of the land condemned growing out of the necessity of the condemnor to acquire the whole (as distinguished from a part) of the property covered by the condemnation proceeding.